UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                :

| | |
|---|---|
| Daniel Barli, and on behalf of himself and all others similarly situated, Bardan One, LLC, and on behalf of themselves and all others similarly situated,    : | **CLASS ACTION COMPLAINT** |
|    : | ___ CV ____ |
|                        Plaintiff,   : | (Jury Trial Demanded) |
|           -against-   : | |
| PNC Bank, National Association, Midland Loan Services, a PNC Real Estate business, CoreVest Finance, AlterDormus, John Prins, Matthew Vilimas, CoreVest American Finance Lender LLC, RWT Holdings, Inc, JOHN DOES 1-50, and XYZ CORPORATIONS 1-50    : | |

-------------------------------------------------------------X

      Plaintiff Daniel Barli ("Barli"), by his attorney RITA DAVE, ESQ., on behalf of himself and all others similarly situated, and Plaintiff Bardan One, L.L.C. ("Bardan"), on behalf of themselves and all others similarly situated, file this Class Action Complaint ("Complaint") against Defendants PNC Bank, National Association ("PNC"), Midland Loan Services, a PNC Real Estate business ("Midland"), CoreVest Finance and CoreVest American Finance Lender LLC and RWT Holdings, Inc (collectively "Corevest"), AlterDormus ("AlterDormus"), John Prins ("Prins"), and Matthew Vilimas ("Vilimas"), and alleges the following:

## **NATURE OF THE ACTION**

      1.     This action seeks to redress the unfair and deceptive practices committed by PNC, Midland, CoreVest, AlterDormus, Prins, and Vilimas in connection with their mortgage

origination and mortgage loan servicing businesses. Taking advantage of any possible opportunity, PNC, Midland, Corevest, AlterDormus, Prins and Vilimas originate and service mortgage loans according to practices designed to maximize fees assessed on borrowers' accounts any time possible, without disclosure or warning. Consistent with their practices, PNC, Midland, Corevest, AlterDormus, Prins and Vilimas engage in deceptive and unfair schemes to collect fees for unnecessary reasons, cheating borrowers at every opportunity they can.

2.     Utilizing Corevest to sell their loans and provide false representations to borrowers, PNC, Midland, Corevest, AlterDormus, Prins and Vilimas rake in egregious fees on a regular basis at the expense of borrowers and with no notice or disclosure to the borrowers.

3.     This practice is in stark contrast to generally accepted lending practices, which require disclosures to borrowers of the fees being charged, their purpose and an agreement from the borrower.

4.     Using automated systems to trigger fees to borrowers without disclosure, PNC, Midland, Corevest, AlterDormus, Prins and Vilimas engage in predatory lending practices to take advantage of borrowers who reach out for assistance with their mortgage loans.

5.     No reasonable customer would ever enter into a mortgage loan with PNC, Midland, Corevest, AlterDormus, Prins and Vilimas if they knew that they would engage in such unconscionable and egregious lending practices in an effort to maximize their own profits at the expense of the customers.

6.     Nor would any reasonable customer, when presented with a uniform and non-negotiable mortgage security agreement serviced by PNC, Midland, Corevest, AlterDormus, Prins and Vilimas, understand or expect that PNC, Midland, Corevest, AlterDormus, Prins and

Vilimas would charge exorbitant fees at any chance they had to do so and require the customer to pay them without notice.

7.      Nor would any reasonable customer ever enter into an agreement with *any* lender who would encourage them to default on their mortgage loans to access their own escrowed funds, while being automatically charged fees while they are seeking assistance from their lender.

8.      Plaintiff brings this action seeking injunctive relief and damages on behalf of himself and the hundreds of thousands or millions of borrowers who have been victimized by PNC, Midland, Corevest, AlterDormus, Prins and Vilimas' uniform practices of charging exorbitant and egregious fees.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) (CAFA) because (a) there are 100 or more Class Members, (b) at least one Class Member is a citizen of a state that is diverse from PNC's citizenship, and (c) the matter in controversy exceeds $5 million, exclusive of interest and costs.

10.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because this is a judicial district in which PNC resides and because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## PARTIES

11.      Plaintiff Daniel Barli is a resident of New Jersey.

12.      Plaintiff Bardan One, L.L.C. is a limited liability company located in New Jersey.

13.     Defendant PNC is a national banking association, with a main office and principal place of business in Pittsburgh, Pennsylvania.

14.     Defendant Midland is a real estate business of PNC, with a main office and principal place of business in Overland Park, Kansas.

15.     Defendant Corevest is a mortgage originator with an office in New York, New York and another office in Irvine, California.

16.     Defendant CoreVest American Finance Lender LLC is a lender with offices in New York, New York.

17.     Defendant RWT Holdings, Inc is the parent company of Corevest with offices in California.

18.     Defendant AlterDormus is a loan servicer with a main office and principal place of business in Chicago, Illinois.

19.     Defendant John Prins is an individual who works as the Vice President for Corevest and has a place of business in New York, New York.

20.     Defendant Matthew Vilimas is an individual who works as the Associate Director for North America for AlterDormus and has a place of business in Chicago, Illinois.

## FACTS

21.     PNC utilized Corevest and Prins to originate mortgage loans to consumers looking to acquire properties over a period of years out of the New York office.

22.     Corevest and Prins make representations and offer pricing to potential borrowers to sell them a mortgage loan product.

23.     Corevest and Prins solicited Barli for four different mortgage loans, spanning over 60 single-family homes as collateral.

24.     Corevest and Prins affirmatively represented to Barli that as part of the mortgage payment, there would be an escrow for Capital Expenditures, which could be drawn upon at Borrower's request.

25.     Neither Corevest nor Prins ever disclosed that there would be a fee incurred for each draw request of Borrower's own funds.

26.     Corevest and Prins affirmatively represented that each loan had a standard five-year prepayment schedule, which is common in commercial financing.

27.     Corevest and Prins further represented that there would be a Holdback Reserve as part of the mortgage payment, which again were Borrower's own funds, which could be drawn upon at Borrower's request.

28.     Once again, neither Corevest nor Prins disclosed that there would be any fee to access these funds, nor that they would require Borrower to default on their mortgage loan.

29.     Prins sent an email to Barli offering a $1,000 closing cost credit if the initial expense deposit wire was sent by November 21, 2018. (a true and accurate copy of the email from Prins to Barli, dated November 21, 2018 is annexed hereto as "Appendix A.")

30.     In reliance on Prins' email, Barli wired the expense deposit to Corevest and Prins.

31.     The day before closing on that loan, in a classic bait-and-switch action, Prins called Barli to tell him that he made a mistake and the credit would only be for Five Hundred Dollars ($500.00) instead of One Thousand Dollars ($1,000.00), as he had previously represented.

32.     When Barli questioned Prins about it, Prins threatened to not close the loan over this and called Barli an "asshole" and hung up on him.

33.     Since so much time and money had been expended by Barli to get to closing, the loan closed with only the $500 credit. (a true and accurate copy of the signed HUD statement is annexed hereto as "Appendix B.")

34.     The credit of only $500.00 appears on line 205 of the HUD statement.

35.     Barli took out four (4) separate mortgages with PNC, Corevest, and Prins.

36.     The first mortgage covered a portfolio of ten (10) single-family homes.

37.     The second mortgage covered a portfolio of nineteen (19) single-family homes.

38.     The third mortgage spanned a portfolio of fourteen (14) single-family homes.

39.     The fourth mortgage covered a portfolio of twenty-nine (29) single-family homes.

40.     After making mortgage payments for several years, Barli contacted Corevest to recapture some of his escrowed funds for Capital Expenditures performed on the properties.

41.     Barli emailed with PNC, Corevest and Midland over a period of seven (7) months in an effort to get his own funds back for the repairs that were performed. (a true and accurate copy of emails between Barli, Corevest and Midland are annexed hereto as "Appendix C.")

42.     PNC, Corevest and Midland charged Barli Two Hundred Fifty Dollars ($250.00) *per draw request*.

43.     PNC, Corevest and Midland, in concert with each other and at the direction of one another, engaged in deceptive practices but ignoring emails from Barli, shifting blame to each other, and unilaterally deciding what would be reimbursable.

44.    PNC, Corevest and Midland willfully delayed the process of giving Barli back his own escrowed funds. (See Appendix C, email from CJ Suzuki to Barli, stating it should take 2 weeks from submitting the complete package to receive funds)

45.    PNC, Corevest and Midland unilaterally reduced the draw request by determining that certain items were non-reimbursable, demanding that Barli submit *another new* draw request to obtain the additional funds, in an effort to charge *another* Two Hundred Fifty Dollar ($250.00) fee on the loan. (a true and accurate copy of emails between Barli, PNC, Corevest and Midland are annexed hereto as "Appendix D.")

46.    In the last draw request made by Barli, PNC and Midland unilaterally reduced the amount again, forcing Barli to request those funds on the next draw request, forcing another fee to be incurred. (a true and accurate copy of the email from Elizabeth Buckley to Barli, dated January 22, 2020 is annexed hereto as "Appendix E.")

47.    PNC, Midland, Corevest, AlterDormus, Prins and Vilimas began engaging in even more egregious and shocking conduct once the COVID-19 pandemic broke out.

48.    In April of 2020, Barli contact PNC and Midland in an effort to discuss options for the hardships being faced by millions across our country. (a true and accurate copy of the email between Barli and Carla Byers, dated April 2, 2020 is annexed hereto as "Appendix F.")

49.    Carla Byers ("Byers"), an Asset Manager for Midland,bar knew that given the pandemic, Barli was in a difficult financial position and was requesting relief options for the mortgage payments.

50.     Over the next four (4) months, Byers, PNC and Midland unilaterally changed their options for borrowers. (true and accurate copy of emails between Byers and Barli, from April – June, 2020 are annexed hereto as "Appendix G.")

51.     The new options being offered by PNC, Corevest and Midland all came with hefty fees the borrower would have to pay.

52.     PNC, Corevest and Midland had actual knowledge that Barli was facing financial hardships due to the COVID-19 pandemic and still tried to force egregious fees onto him. (see Appendix G)

53.     For the fourth of Bali's mortgages, there was a Holdback Escrow of $17,527.96, which Barli asked to utilize to make one months' mortgage payment, to enable the portfolio to get up and running. (see Appendix G)

54.     After weeks of intentionally delaying the processing of returning Barli's own escrowed funds back to him, PNC, Corevest and Midland ignored Barli's request and forced him to incur a late charge and an NSF fee assessed by PNC, Corevest and Midland. (see Appendix G)

55.     On June 15, 2020, DeAnna Barela, a Loan Servicing Senior Analyst for Midland sent an email to Byers stating that Barli had advised that he wanted to use his escrowed funds to cover the mortgage payment. (a true and accurate copy of that email from Barela to Byers, dated June 15, 2020 is annexed hereto as "Appendix H.")

56.     After several more weeks of review by PNC, Corevest and Midland, knowing that the Borrower was experiencing financial hardship as a result of the pandemic, Byers email Barli that using his own escrowed funds would constitute a modification of the loan and would require an *initial* legal retainer of Five Thousand Dollars ($5,000.00) to proceed (see Appendix H).

8

57.     Barli spoke via telephone to Byers who explained that the legal retainer could end up as high as Twenty Thousand to Thirty Thousand Dollars ($20,000 - $30,000) for this modification.

58.     Barli responded by stating that the loan agreement stated exactly what was being asked for and that no modification was being requested at all. (see Appendix H)

59.     Byers proceeded to respond that to continue with using Barli's own funds, PNC and Midland would have to declare Barli's loan in default due to non-payment, in a further international act to charge additional fees to the mortgage. (see Appendix H)

60.     Byers then proceeded to try and charge Barli  an additional processing fee of $500 to  $1,000 per loan. (see Appendix H)

61.     Barli continued to explain to Byers, PNC and Midland that he was not late, nor seeking any modification. He was simply looking to use his own escrowed funds to cover the mortgage payment, of which there was plenty of.

62.     Despite the numerous requests and emails documenting everything, PNC, Corevest and Midland forced the loan into default so they could charge exorbitant fees against Barli.

63.     In August of 2020, Barli contacted Corevest in an effort to discuss options for two of his mortgages.

64.     Corevest directed Barli to contact Midland again, which Barli did. (a true and accurate copy of the email from Barli to Tonya Bolanos ["Bolanos"], dated August 13, 2020 is annexed hereto as "Appendix I.")

9

65.     Barli inquired about the prepayment penalty on the loan, which was represented by Prins, PNC and Corevest to be a standard five-year prepayment schedule.

66.     Bolanos stated she could not provide a payoff without having a formal quote prepared, which costs Two Hundred and Fifty Dollars ($250.00) per request. (see Appendix I)

67.     As evidenced from the email exchanges between Bolanos and Corevest and Barli, Midland was directing Barli to Corevest and Corevest was simply redirecting Barli back to Midland, in an international effort to frustrate and thwart Barli's efforts.

68.     In October of 2020, Barli was introduced to Vilimas as someone who could provide assistance with the mortgage payments given the state of affairs with the COVID-19 pandemic.

69.     Barli sent an email to Vilimas, stating he was trying to be proactive and asking for a disclosure of fees before moving forward. (a true and accurate copy of the email from Barli to Vilimas, dated October 13, 2020 is annexed hereto as "Appendix J.")

70.     Vilimas responded that to even consider a forbearance agreement, there would be fees, "which would include but are not limited to legal fees, a loan modification fee, and Special Servicing Fees." (see Appendix J)

71.     Barli emailed Vilimas on October 16, 2020, stating that due to the exorbitant fees, it did not make sense to get a forbearance. (a true and accurate copy of the email from Barli to Vilimas, dated October 16, 2020 is annexed hereto as "Appendix K.")

72.     During that time period, Barli emailed Byers about selling off partial units on another mortgage, serviced by PNC and Midland. (true and accurate copy of emails between Barli, Byers and PNC are annexed hereto as "Appendix L.")

73.     Byers had represented to Barli in an earlier call that the standard five-year prepayment schedule was followed, as evidenced by Barli's email dated November 16, 2020 to Byers. (see Appendix L)

74.     Rachel LaCombe, an Asset Manager for Midland, responded to that email stating that "we cannot give you a rough estimate of this premium without ordering a quote from our Payoff Dept." and trying to charge *another* Two Hundred Fifty Dollar ($250.00) fee to prepare a payoff. (see Appendix L)

75.     When Barli further questioned Rachel LaCombe, she responded that "the calculation is complex and is only calculated by the Payoff Dept." trying to charge another Two Hundred Fifty Dollar ($250.00) fee on the loan. (a true and accurate copy of the email from Rachel LaCombe to Barli, dated November 19, 2020 is annexed hereto as "Appendix M.")

76.     Meanwhile, Vilimas had emailed Barli again on October 29, 2020 to advise him that the prepayment penalty on one mortgage loan, with a principal balance of $737,000 would be Three Hundred Twenty Thousand Dollars ($320,000.00) **plus** legal fees and accrued interest. (a true and accurate copy of the email from Vilimas to Barli, dated October 29, 2020 is annexed hereto as "Appendix N.")

77.     Barli was appalled at this egregious and exorbitant payoff figure and expressed that to Vilimas by telephone.

78.     On December 3, 2020, Vilimas emailed Barli stating Barli owed One Thousand Five Hundred Dollars ($1,500.00) for the few conversations and emails with Barli. (a true and accurate copy of the email from Vilimas to Barli, dated December 3, 2020 is annexed hereto as "Appendix O.")  Vilimas represented to Barli that all four (4) mortgages have the same payoff structure and apologized that Prins and others had previously indicated otherwise.

11

79.     Vilimas then proceeded to demand the payment and threatened that additional fees would accrue if Barli did not pay the $1,500.00. (see Appendix O)

80.     Barli responded to Vilimas that no fees were ever disclosed to him, despite Barli asking repeatedly for that and asked for documentation in writing of the fees being disclosed to Barli. (see Appendix O)

81.     Vilimas responded that "I understand that we did not come to terms on a loan modification, but being transferred to Special Servicing **automatically triggers the accrual of those fees.**" (See Appendix O, emphasis added)

82.     The repeated course of conduct and bad faith exuded by all the Defendants are completely unreasonable and egregious, shocking the conscience of any reasonable person. Defendants knew that Plaintiff was dealing with financial hardships due to the COVID-19 pandemic, yet proceeded to charge excessive and unnecessary fees, instead of providing any assistance.

83.     The deplorable actions taken by the Defendants should not be tolerated by this Court under any circumstances.

## **CLASS ACTION ALLEGATIONS**

84.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action against PNC, Midland, Corevest, AlterDormus, Prins and Vilimas as a class action on behalf of themselves and all members of the following nationwide class: All mortgagors of a mortgage originated and./or serviced by PNC, Midland, Corevest, AlterDormus, Prins and Vilimas who were charged excessive fees at every possible opportunity by Defendants (the "National Class").

85. All of the members of the classes and sub-classes are collectively referred to as the "Class" or "Class Members."

86. Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether class certification is appropriate.

87. Excluded from the Class are: (i) Defendant and any entities in which Defendant has a controlling interest; (ii) any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant; (iii) the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; and (iv) all governmental entities.

88. The members of the Class are so numerous that their joinder is impracticable.

89. All members of the Classes have been subject to and affected by the same practices and policies described herein. There are questions of law and fact that are common to the Classes and which predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to, the following:

   a. Whether Defendants engaged in a uniform practice of deception and fraud in originating mortgage loans.

   b. Whether Defendants engaged in a uniform practice of deceptively and unfairly assessing fees against borrowers for services that were unnecessary and unreasonable.

   c. Whether Defendant engaged in a uniform practice that violated that the terms of uniform mortgage agreements.

   d. Whether Defendants' unlawful, deceptive, fraudulent and unfair practices harmed Plaintiff and the Class.

   e. Whether the Court can enter declaratory and injunctive relief; and

f.      The proper measure of damages.

90.     The claims of the named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that the Plaintiffs and the other members of the Class were subject to the same wrongful policies and practices by Defendants.

91.     The individually named Plaintiffs will fairly and adequately represent the interests of the proposed Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in litigation matters.

92.     Counsel competent and experienced in federal class action and federal civil rights litigation has been retained to represent the class.   In that regard, Rita Dave, Esq. is an experienced attorney with extensive experience in litigation.   Daniel Barli, Esq., is likewise an experienced commercial litigator with extensive experience in complex transactions.   Moreover, plaintiff's counsel intend to retain co-counsel specializing in federal class action and federal civil rights litigation.

93.     This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable. The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt individual redress for damages.

94.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the

Class which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the Class.

95.    The Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate

96.    The Class is easily ascertainable as Defendants' computerized records can identify all mortgagors who took out loans with their companies and all mortgagors who have contacted them for relief options.

97.    The questions of law and fact common to members of the Classes predominate over any questions affecting only individual members.

98.    Notice to the proposed Class can be achieved through the U.S. mail to the addresses of the Class members that are kept within Defendants' records.

99.    A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

a.    Individual claims by the members of the Class are impractical as the costs of litigation far exceed what any one individual plaintiff has at stake.

b.    As a result, individual members of the Classes have no interest in prosecuting and controlling separate actions.

c.    It is desirable to concentrate litigation of the claims herein in this forum; and

d.    The proposed Class is manageable.

100.     Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action

101.     There will be no extraordinary difficulty in the management of this class action.

102.     Final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Breach of Contract; New York Law)**

103.     Plaintiff repeats each and every allegation contained in paragraphs 1 – 102 of the Complaint as though set forth at length herein and makes them part hereof.

104.     Plaintiffs bring this claim for relief on behalf of themselves and the members of the Class.

105.     Plaintiffs and members of the Class entered into mortgage agreements with substantially similar language providing that PNC, Midland, Corevest, AlterDormus, Prins and Vilimas would only charge for services when they are needed or reasonable.   Plaintiffs and members of the Class performed in accordance with their contractual obligations.

106.     PNC, Midland, Corevest, AlterDormus, Prins and Vilimas failed to perform in accordance with the contract and breached these mortgage agreements by assessing fees against Plaintiff and the Nationwide Class members for every possible instance, including accessing the borrower's own escrowed funds, ordering payoffs, and simply speaking with the servicer about loan options.

107.    As a result of this breach of contract, Defendants have caused and continues to cause injury to Plaintiff and the Class members, who paid or will pay fees for unreasonable and unnecessary services.

108.    Defendants have also breached the duty of good faith and fair dealing. Mortgagors like Plaintiff reasonably expected that Defendants would use any discretion it has with respect to ordering and charging for services in good faith and that it would only charge fees when they were reasonable or necessary. But Defendants frustrated those expectations by not using its discretion at all, but instead ordering charging fees whenever possible and using an automated system, or by abusing that discretion to charge fees that were nether reasonable nor necessary. Mortgagors like Plaintiff would not have entered into their mortgages with PNC if they knew their reasonable expectations with respect to services would be frustrated.

109.    As a result of the foregoing, Plaintiffs and Class members suffered substantial damages for which defendants are liable.

110.    Plaintiffs and the Class members are also entitled to injunctive, equitable, and declaratory relief, including an injunction barring Defendant from committing future breaches of its contractual obligations.

### SECOND CAUSE OF ACTION
**(Violation of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq*;
Affirmative Misrepresentations and Knowingly Material Omissions)**

111.    Plaintiff repeats each and every allegation contained in paragraphs 1 – 110 of the Complaint as though set forth at length herein and makes them part hereof.

112.    Plaintiffs bring this action on behalf of themselves and the Class against Defendants.

113.   The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 prohibits

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false presence, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

114.   Defendants have violated the New Jersey Consumer Fraud Act by knowingly and intentionally engaging in the deceptive, misleading, and unfair practices described herein, which are unconscionable, and which offend public policy and which are immoral, unethical, unscrupulous and substantially injurious to consumers.

115.   Defendants affirmatively misrepresented and intentionally, knowingly, omitted material information regarding the nature of the fees that would be assessed to borrowers' accounts for unnecessary and unreasonable services.

116.   Despite having actual knowledge that the fees charged were unnecessary and unreasonable, Defendants concealed the fact that borrowers would automatically and repetitively be charged for such services.

117.   Defendants acted deceptively by presenting borrowers with mortgage agreements that misleadingly and deceptively indicate that borrowers will not be charged for unnecessary and unreasonable services.

118.   Defendants did so, despite knowledge that borrowers would be automatically and repeatedly charged for unnecessary and unreasonable services.

119.    Defendants' unfair and deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs and the Class Members, into believing that they would only be charged for reasonable or necessary services related to their mortgage.

120.    Regardless of the terms of any applicable mortgage agreement, Defendants also engaged in deceptive conduct by engaging in a practice of automatically and repeatedly assessing fees against borrowers in financial difficulty without regard to, or consideration of, whether those services were necessary and reasonable.

121.    Defendants did so through an automated system and through intentional actions and did not consider whether services would be reasonable or necessary.

122.    Defendants knew or should have known that their conduct violated the New Jersey Consumer Fraud Act.

123.    Defendants' unfair or deceptive trade practices were fraudulently concealed and likely to, and did, deceive reasonable consumers, including the Plaintiffs and Class Members, into believing that they would only be charged for reasonable or necessary services. Defendants intentionally and knowingly misrepresented and/or omitted material facts regarding services with the intent of deceiving Plaintiffs and Class Members.

124.    Defendants' violations present a continuing risk to Plaintiffs and Class Members, as well as to the general public who risk irreparable injury as a result of Defendants' acts and omissions in violation of the New Jersey Consumer Fraud Act. Defendants' unlawful acts and practices complained of herein affect the public interest.

125.    Plaintiffs and Class Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive acts and omissions. Plaintiffs and

Class Members would not have entered into a mortgage with PNC if they knew they would be charged for unreasonable or unnecessary services.

126.    As a direct and proximate result of Defendants' violations of the New Jersey Consumer Fraud Act, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damages.

127.    Plaintiffs and Class Members are entitled to recover three times actual damages, attorneys' fees, costs and other relief under N.J.S.A. 56:8-1.

128.    Plaintiffs and Class Members also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the New Jersey Consumer Fraud Act.

### THIRD CAUSE OF ACTION
**(Unjust Enrichment; New York Law)**

129.    Plaintiff repeats each and every allegation contained in paragraphs 1 – 128 of the Complaint as though set forth at length herein and makes them part hereof.

130.    Plaintiff and the members of the Classes conferred a benefit upon Defendants in the form of fees for unnecessary and unreasonable services.

131.    Defendants received this benefit with an appreciation or knowledge of the benefit.

132.    Defendants accepted and retained the benefit under circumstances that make it inequitable for the receiving party to retain the benefit.

133.    Defendants were enriched at Plaintiff and the other Class Members' expense,  that enrichment was against equity and good conscience, and it would go against equity and good conscience to permit the Defendants to retain what is sought to be recovered in this lawsuit.

134.   As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damages.

135.   As a result, Plaintiffs and the Class Members are entitled to a disgorgement of all amounts Defendants have been unjustly enriched, as well as their actual damages, punitive damages, reasonable attorney's fees and costs, and injunctive, declaratory, and equitable relief barring future unlawful conduct by Defendants.

## FOURTH CAUSE OF ACTION
### (Fraud; New York, New Jersey and Federal Common Law)

136.   Plaintiff repeats each and every allegation contained in paragraphs 1 – 135 of the Complaint as though set forth at length herein and makes them part hereof.

137.   Defendants made material, affirmative, fraudulent statements, and material omissions, to Plaintiffs and Class Members throughout the process of the mortgage loans.

138.    Defendant knew of the falsity of their representations and omissions.

139.   Defendant acted with intent to defraud the Plaintiff and Class Members.

140.   Plaintiffs and Class Members detrimentally relied on those statements made by Defendants.

141.   As a direct and proximate result of Defendants' fraud, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damages.

142.   As a result, Plaintiffs and the Class Members are entitled to their actual damages, punitive damages, reasonable attorney's fees and costs, and injunctive, declaratory, and equitable relief barring future unlawful conduct by Defendants.

## <u>FIFTH CAUSE OF ACTION</u>
### (Usury; New York Law)

143.    Plaintiff repeats each and every allegation contained in paragraphs 1 – 142 of the Complaint as though set forth at length herein and makes them part hereof.

144.    In New York, statute caps interest at 16 percent.

145.    Interest charged in excess of 25 percent may constitute criminal usury.

146.    Defendants have engaged in unconscionable usury by charging payoff figures in excess of Forty-Three Percent (43%).

147.    Defendants intentionally engage in usury at the expense of Plaintiffs and the Class Members.

148.    Defendants made Plaintiff and Class Members numerous loans for money.

149.    There was an understanding between the parties with respect to each of those loans that the principal will be repayable absolutely.

150.    The loans and interest rate charged provided Defendants with the exaction of a greater profit than is allowed by the above statutes.

151.    Defendant knowingly and intentionally set about to, and actually did, violate the usury statutes.

152.    As a direct and proximate result of Defendants' usury, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damages.

153.    As a result, Plaintiffs and the Class Members are entitled to their actual damages, punitive damages, reasonable attorney's fees and costs, and injunctive, declaratory, and equitable relief barring future unlawful conduct by Defendants.

## COUNT SIX
### (Civil Conspiracy; New York and Federal Law)

154.     Plaintiff repeats each and every allegation contained in paragraphs 1 – 153 of the Complaint as though set forth at length herein and makes them part hereof.

151.     Defendants PNC, Midland, CoreVest, AlterDormus, Prins, and Vilimas, knowingly and intentionally conspired, acted in concert, aided and abetted, with each other, John Does 1-50, and XYZ Corporations 1-50, in a purposeful scheme to charge egregious and usurious fees against Plaintiffs and Class members.  Specifically, defendants all explicitly and/or implicitly agreed to commit with each other and/or other unnamed conspirators, the wrongs detailed above, and to ultimately deceive Plaintiff and force him to pay exorbitant, unnecessary, and at times illegal fees and other charges.

152.     Each defendant then committed overt acts, as detailed above in paragraphs 21 through 153, to accomplish the goal of the conspiracy, including, but not limited to, unjustly enriching themselves by forcing Plaintiff to pay exorbitant, unnecessary, and at times illegal fees and other charges.

153.     Defendants further deflected blame to each other at every opportunity to avoid returning Plaintiffs' escrowed funds to him and Class members.

154.     Defendants intended and acted to carry out the intent to charge exorbitant fees repeatedly against Plaintiffs and Class Members.

155.    Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to them, or to the effect of such misconduct upon them.

156.    As a result, Plaintiffs and the Class Members were substantially damaged and are entitled to their actual damages, punitive damages, reasonable attorney's fees and costs, and injunctive, declaratory, and equitable relief barring future unlawful conduct by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment against Defendants as follows:

A.    Certifying this action as a class action, with the Class as defined above;

B.    Requiring that Defendants pay for notifying the Class members of the pendency of this suit;

C.    Awarding Plaintiffs and the Class all injunctive, declaratory, and equitable relief to which they are entitled;

D.    Awarding Plaintiffs and the Class monetary damages in an amount to be determined at trial, together with pre and post-judgment interest;

E.    Awarding Plaintiffs and the Class statutory damages in the maximum amount provided by law;

F.    Awarding Plaintiffs and the other Class members the reasonable costs and expenses of suit, including their attorneys' fees;

G.    Pre-judgment interest as allowed by law; and

H.    For any further relief that the Court may deem appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues subject to trial.

Dated: December 22, 2020

_____
RITA DAVE, ESQ.
Dave Law, PC
26 Court Street
Suite 1212
Brooklyn, New York 11242
Telephone: (518) 782-1614
Email: ritadaveesq@gmail.com

DANIEL BARLI, ESQ. (*pro hac vice* forthcoming)
Barli & Associates, LLC
600 Getty Avenue, Suite 304
Clifton, NJ 07011
Telephone: (973) 638-1101
Fax: (201) 326-5176
Email: office@barlilaw.com

*Counsel for Plaintiff and the Classes*